IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs March 25, 2026

## STATE OF TENNESSEE v. TIMOTHY SEDMAN

**Appeal from the Circuit Court for Rhea County**
**No. 2020-CR-275   Justin C. Angel, Judge**

———————————————————

### No. E2025-00576-CCA-R3-CD

———————————————————

The defendant, Timothy Sedman, pled guilty to attempted aggravated sexual battery, and the trial court imposed a sentence of six years' incarceration in the Tennessee Department of Correction. On appeal, the defendant argues the trial court erred in denying his request for alternative sentencing. After reviewing the record and considering the applicable law, we affirm the judgment of the trial court. However, we remand the case for corrected judgment forms in counts one through five and counts seven through twenty.

**Tenn. R. App. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed and Remanded for Entry of Corrected Judgments**

J. ROSS DYER, J., delivered the opinion of the court, in which TIMOTHY L. EASTER, and TOM GREENHOLTZ, JJ., joined.

Howard L. Upchurch and Stacy H. Farmer, Pikeville, Tennessee, for the appellant, Timothy Sedman.

Jonathan Skrmetti, Attorney General and Reporter; Lacy E. Wilber, Senior Assistant Attorney General; Courtney Lynch, District Attorney General; and Cameron Williams, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### *Facts and Procedural History*

### I.     Guilty Plea

On December 7, 2020, the defendant was indicted for five counts of rape of a child (counts one through five), five counts of aggravated sexual battery (counts six through ten),

five counts of statutory rape by an authority figure (counts eleven through fifteen), and five counts of aggravated statutory rape (counts sixteen through twenty). The defendant ultimately entered a best interest guilty plea to one count of the lesser-included offense of attempted aggravated sexual battery in count six, and the remaining counts were dismissed as part of the plea deal. Pursuant to the plea agreement, the defendant agreed to a six-year sentence as a Range I offender, with the manner of service to be determined by the trial court.

The transcript of the guilty plea hearing is not included in the record on appeal; therefore, we glean the factual background giving rise to the plea from the presentence report. The agency's statement of events provided that

> from January 1, 2020 to October 15, 2020, on multiple occasions [step]father, [the defendant], did sexually assault his [step]daughter inside of his home at various times against her will and/or consent in Rhea County.

The presentence report also contained the defendant's version of events. According to the defendant, he

> married [M.R.'s][1] mother 8/13. She is a career criminal. She was arrested in NC and DCS called me to come get [M.R.]. [M.R.] did not like anything about being over here and not with her mother. She hated rules, my wife, my mother, her sister and everything about being over here.
>
> My ex-wife weaponized her daughter against me. There is no evidence for something that did not happen. I testified against [M.R.'s] mother in court in Rhea County in 2015. She spent a year in jail. I 100% believe she is behind all of this.
>
> Last time we looked, [M.R.'s mother] had 76 charges in several different states. Before this I had zero.
>
> [M.R.] had contact with her mother daily. I am sure this is where she was told what to say. I am a good dad.
>
> One thing I learned is if you get mad at someone all you have to do is swear out a warrant, make up any story and stay with it. No evidence needed. I would never do that.

---

[1] It is the policy of this Court to refer to victims of sexual abuse by their initials. For purposes of this opinion, "the victim" will refer to M.R. unless otherwise noted.

- 2 -

I have dealt with this for 50 months. Never once did I get a chance to tell my side of the story.

## II. Sentencing Hearing

During the sentencing hearing, a copy of the defendant's presentence report and psychosexual evaluation were introduced. During her victim impact statement, the victim noted that she had waited five years to confront the defendant in court. She stated that, although the defendant "raped [her] when [she] was twelve years old" and "tortured [her] in ways [she] can't even explain," she can "rest peacefully knowing he is trapped behind bars" and "can't hurt [her] again." The victim stated that she "was supposed to be protected by [the defendant]" because he was the "only father that [she] ever had." The victim noted that she became suicidal following the defendant's abuse because she "thought the only way of escaping [the defendant] was shooting [herself] in the head." The victim requested the defendant serve his six-year sentence in confinement because "he had [her] do things to him that [her] little elementary school 12-year-old self should never have to do with an adult man."

The defendant submitted multiple letters in support of his character and called Anita Sedman, Susan Valdez, and Ginger Sedman to testify on his behalf.

Anita Sedman, the defendant's wife, testified that she married the defendant three years ago but was living with the defendant in 2020. Also living in the home were the defendant's mother and daughter, S.S. According to Ms. Sedman, in January 2020, the defendant received a request from the Department of Children's Services in North Carolina to pick up the twelve-year-old victim, who was living in a children's home. When the victim moved into the defendant's home, she began seeing a psychologist, and Ms. Sedman learned that the victim was suicidal and had "marks" on her arms.

Ms. Sedman testified that the defendant suffers from multiple medical conditions and takes numerous medications. Following his release on bond, the defendant complied with all pre-trial bond conditions imposed by the trial court, including a no-contact order with the victim. According to Ms. Sedman, the defendant "[became] more depressed, more withdrawn into himself" since his arrest. Ms. Sedman testified that the defendant does not abuse alcohol or illegal drugs; however, she acknowledged that the defendant used marijuana in Ohio, where it is "legal to partake in marijuana usage." The defendant also disposed of his firearms as suggested by the Department of Probation. On cross-examination, Ms. Sedman testified that the defendant developed a cyst on his back in August 2020 and used Gabapentin, a nerve medication, Flexeril, a muscle relaxer, and ibuprofen to control his symptoms. Ms. Sedman testified that she and the defendant shared

a bedroom upstairs while the victim, the defendant's mother, and S.S., the victim's half-sister, lived downstairs. Ms. Sedman agreed that the victim "briefly" moved upstairs in late August 2020 but denied that the victim was ever alone with the defendant. On redirect examination, Ms. Sedman testified that the victim never disclosed that the defendant was abusing her. On recross-examination, Ms. Sedman agreed that she learned of the allegations after the victim told the defendant's sister.

Susan Valdez, the defendant's sister, resides in a home on the same property as the defendant. When the victim began living with the defendant in 2020, Ms. Valdez "considered [the victim her] niece at the time" and had a "friendly" relationship with her. Although she did not speak to the victim every day, Ms. Valdez would sometimes drive her to events. On October 8, 2020, Ms. Valdez took the victim to a ball game, and when she drove the victim home, the victim disclosed that the defendant had raped her. Although Ms. Valdez did not believe the victim, she told the victim to speak to her school counselor and take a pregnancy test. According to Ms. Valdez, there were ongoing issues between the victim and the defendant because the victim ran away, for which the defendant punished her by taking away her cell phone. Ms. Valdez testified that, because of the defendant's arrest, S.S. lived with her and is no longer allowed to see the defendant.

Ginger Sedman,[2] the defendant's mother, testified that the defendant began living with her in 2017 when her husband died. According to Ginger, the defendant was "a pretty good boy," who chewed tobacco as "his way of rebelling." After high school, the defendant had a steady work history, including eighteen years at La-Z-Boy, prior to becoming disabled. Following his arrest, the defendant became "very depressed. He cries all the time. He really can't finish one thing until he goes to another." Ginger testified that she has cancer and back issues, and the defendant provides her with care and assistance in their home. On cross-examination, Ginger testified that the victim and the defendant were never in the home alone; however, she agreed they would watch television upstairs together by themselves. She also stated that the defendant and the victim took an overnight trip to Gatlinburg by themselves "before school started."

The defendant also provided a statement of allocution, stating that "[a]ll [he] wanted to do was help [the victim]." He said he was "sorry that [the victim] has such hate and anger" for him and does not "blame" the victim but argued that the victim's mother "bears responsibility."

In denying probation, the trial court articulated its reasoning, as follows:

---

[2] Because Anita Sedman and Ginger Sedman share the same last name, we will refer to Ginger by her first name. We intend no disrespect.

- 4 -

The defendant's mental and physical condition and social history, again, there's proof there that he has some medical issues that have developed recently. There is no actual diagnosis or medical records for me to properly consider for that, just multiple testimony now about his, you know, maybe he's depressed or his mental situation that he's going through while these cases have been pending. However, there's no medical proof for me to consider, as far as that goes.

And then, the social history, there were several letters here from people in the community, from the church, from places he worked and so forth, who wrote letters to the [c]ourt vouching for his reputation and character in the community. So the [c]ourt has read all those and considered all those. I considered your physical and mental condition.

The facts and circumstances surrounding the offense and the nature and circumstances of the criminal conduct involved: again, so this is a bit tricky, because you had a lot of indictments against you, a lot of charges against you ranging from A felonies, B felonies, and so forth. Those were negotiated down to a C felony, which you entered the best interest plea to, but the factual recitation at the plea outlined most of the information that [M.R.] shared with the [c]ourt today, and so, even tough, it's a negotiated plea to a lesser-included charge, there are still behavior and conduct within that charge that the [c]ourt absolutely finds shocking and reprehensible, offensive.

I will get back into that factor later, but the [c]ourt has considered that factor and weighed that factor.

The prior criminal history of the defendant or lack thereof: this factor favors you, sir. You have no criminal history, no criminal convictions in your past, so I have to apply the law as I've been told to do, and that says I have to give that weight to you, because you have no criminal history. If you had substantial criminal history, I would be weighing that factor against you, but the law requires me to weigh that in your favor, and I am doing so at this time.

The previous actions and character of the defendant, again, there's no proof to the [c]ourt that he's been a bad person in the community, a bad reputation in the community for decades. There's nobody that has said that. I haven't received any information about that whatsoever. The fact that you

- 5 -

have no criminal history shows that you had conducted yourself accordingly in the community.

The previous actions in regards to this offense that you've entered your best interest plea to, those actions are extremely alarming, but there's not a sustained pattern of previous actions and character of you that I can consider to really weigh against you at this time.

Whether or not the defendant might reasonably be expected to be rehabilitated and the defendant's potential or lack of potential for rehabilitation, including the risk that during the period of probation, the defendant will commit another crime: so there's a couple of parts to that one, obviously. The first part about rehabilitation, in looking at the Strong R assessment, the [c]ourt reviewed that, weighed that. That showed a low risk to reoffend.

And then the PSE, the psychosexual examination showed a [moderate] risk to reoffend, but then a moderate risk – I may be misreading that. Yes, the PSE, which is Exhibit 2 says that [the defendant] has a moderate risk to reoffend.

 . . . .

"[The defendant's] amenability to benefit from treatment is poor. His participation in specific sex offender treatment can be managed in the community. [The defendant] demonstrates complete denial regarding his sexual offending."

So the examiner in the PSE didn't think you could be rehabilitated or was a low risk, I should say – or sorry, low amenability to be rehabilitated.

And based upon my experience in these types of cases and the training I've received through numerous conferences and CLEs and doctors and everything, I don't think people who hurt children like this can be rehabilitated, or if they can, it's extremely difficult to rehabilitate them.

So in referring to that factor, then, I do not find that you are expected to be rehabilitated, that there is a low chance that you could be rehabilitated. So that factor will work against you.

- 6 -

Now, going towards the second part of that factor, about during the period of probation, the defendant will commit another crime. I can't weigh that one against you, sir, because you haven't committed any other crimes before you got to this point, and then while on bond for the past four years or so, you haven't committed any other crimes that you've been arrested for. So I can't hold that part of that factor against you.

Whether or not it reasonably appears the defendant will abide by the terms of his probation: again you've never been on probation for me to judge that. Normally, folks in front of me have been on probation their whole life with lots of violations, it's easy for me to judge and evaluate that situation. You've never been on probation, so I can't go on past behavior, but again, referring to the bond order that was put down a couple of years ago, you've seemed to comply with every aspect of the [c]ourt's order, and you haven't violated the bond order that's been brought to my attention. So if I equate that to being on probation, which is somewhat similar, I think that you would abide by the terms of your probation.

Whether or not the interests of society and being protected from possible future criminal conduct are great: again, if you had a long criminal history, it would be easy for me to analyze this. You don't. I don't think it's a great possibility that when you're out of custody, you're going to commit all these crimes, but it was even recommended in the PSE that you not be alone around young children. So that's alarming.

And then the allegations of the case that we're here on today, extremely alarming. So I'm concerned about that type of action or impulse out of custody, just to be honest with you.

But I do think I have to factor all that information in and give you the benefit of that factor. I do not think it's a great danger to the community or society about your possible future criminal conduct. I think it's possible, but not a huge concern.

Whether or not measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant: they haven't. So that factor weighs in your favor.

Whether or not a sentence of full probation would unduly depreciate the seriousness of the offense: yes, it would. That's my finding. I find that

the crime is shocking, reprehensible, offensive. So that factor weighs against you.

Whether or not confinement is particularly suited to provide an effective deterrent to others likely to commit similar offenses: I believe it is. I believe we have to set a standard in the community that people who do these horrible things to children are punished, and they can't read the newspaper here in the community about so and so did this to a kid or their daughter, stepdaughter, whatever, and now, they've got a slap on the wrist. I think it's important that we set a standard in our community that we're not going to tolerate people sexually assaulting children. I know you pled to an attempt, but the facts bear otherwise. So that factor weighs against you.

Whether or not the offense is particularly enormous, gross, or heinous: again, that typically goes to when I have a homicide case and so forth, and the gruesome crimes that I have to deal with, as well. So I can't find that it was particularly enormous, gross, or heinous, but it was disgusting and shocking and reprehensible and offensive and everything else that I have to find under that certain factor. So I can't necessarily weigh that factor against you, because it doesn't reach that level, but it's right at the edge of me making that finding against you. That's how bad the [c]ourt considers the actions.

I do find that you have still failed to fully accept responsibility, and there has been a lack of candor in your participation in the PSE and other statements made, even today, to the [c]ourt. You blame other people for this. In the presentence report there is a whole long conspiracy theory about [the victim's] mother being the root cause behind all this, and then you get up here today, and you bring it up again, that her mother is to blame. No, you're to blame. And you still haven't really owned that. I agree with [defense counsel], the plea agreement, the punishment you've already agreed to, the lifetime supervision, the sex offender registry and so forth, everything that goes along with that. Yes, I mean, that is partly owning it, but that is not fully owning it.

And then the lack of candor, as far as the participation in the PSE, not really participating in the way the examiner requested, so he could give the [c]ourt a proper analysis of the situation, I think that looks poorly on you.

You know, [the victim] came in here this morning, and she started out the hearing by addressing you and addressing the [c]ourt, and I found her to be very credible. I found her statement to be moving and powerful. I believe

her. I believe that you did this stuff to her, and it's shocking, reprehensible, offensive. She knew details, in looking at the evidence before me, she knew details of sexual activities, and the bodily functions that occur during sexual activities that no 12-year-old girl should know about.

And of course, by saying that, you're going to potentially cast blame about some other boy, and then some guy in North Carolina, but she has accused you of doing this to her. She came to the [c]ourt. I believe what she is saying. I find her credible. I find that your actions in hurting her are shocking.

You were in a position of authority, maybe not under the legal standard of authority figure, but you were still in a position of authority. She considered you to be a father. She was living in your home. You accepted responsibility for her, as far as, "All right. You're in my house. I'm going to take care you." And that trust was shattered, and she will live with that for the rest of her life. Hopefully, she can move beyond it. Hopefully, she finds peace and can find true happiness one day in a relationship. Maybe she can move on and have close to a normal life, despite what you did to her.

The [c]ourt has weighed all of these factors independently. The [c]ourt has also weighed these factors against each other. The [c]ourt finds that for many of those factors, they outweigh the presumption of alternative sentencing. The [c]ourt has already made the findings of facts and circumstances surrounding the offense, the nature and circumstances, the criminal conduct involved. We have already addressed that.

The [c]ourt is weighing heavily on that, but not solely on that. There's the deterrence factor. I believe we have to set a proper standard in our community.

And then the seriousness of the offense, the [c]ourt made the additional findings about the elements of the offense, I think probation would depreciate the seriousness of the offense. All those factors outweigh the factors that were in your favor.

And the [c]ourt will sentence you to serve six years in the Tennessee Department of Correction[].

*Analysis*

On appeal, the defendant argues the trial court erred in denying probation. The State contends the trial court acted within its discretion when it sentenced the defendant to confinement. Following our review, we agree with the State.

A trial court's decision to grant or deny probation is reviewed under an abuse of discretion standard with a presumption of reasonableness when the sentence reflects the purposes and principles of sentencing. *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012). "[A] trial court's decision to grant or deny probation will not be invalidated unless the trial court wholly departed from the relevant statutory considerations in reaching its determination." *State v. Sihapanya*, 516 S.W.3d 473, 476 (Tenn. 2014) (order) (per curiam). The burden of establishing suitability for probation rests with a defendant, who must demonstrate that probation will "'subserve the ends of justice and the best interest of both the public and the defendant.'" *State v. Souder*, 105 S.W.3d 602, 607 (Tenn. Crim. App. 2002) (quoting *State v. Dykes*, 803 S.W.2d 250, 259 (Tenn. Crim. App. 1990)); *see* Tenn. Code Ann. § 40-35-303(b); *State v. Russell*, 773 S.W.2d 913, 915 (Tenn. 1989); *State v. Carter*, 254 S.W.3d 335, 347 (Tenn. 2008).

Generally, probation is available to a defendant sentenced to ten years or less. Tenn. Code Ann. § 40-35-303(a). A defendant who is convicted as an especially mitigated or standard offender of a Class C, D, or E felony is considered a favorable candidate for probation. Tenn. Code Ann. § 40-35-102(6)(A). In determining whether incarceration is appropriate, the trial court should consider whether:

> (A)     Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B)     Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses;
>
> (C)     Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

Tenn. Code Ann. § 40-35-103(1)(A)-(C). Additionally, "[t]he sentence imposed should be the least severe measure necessary to achieve the purposes for which the sentence is imposed," and "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed." *Id.* § 40-35-103(4), (5).

Following the defendant's statement of allocution, the trial court noted that it had considered the evidence presented at the sentencing hearing, including the presentence report, the principles of sentencing, arguments as to sentencing alternatives, the nature and characteristics of the criminal conduct involved, the statistical information provided by the Administrative Office of the Courts, the defendant's statement made on his own behalf, and the potential for rehabilitation and treatment.

In denying probation, the trial court noted that, although the defendant entered a best interest plea to one lesser-included offense, he was originally charged with twenty felonies. The trial court found the defendant's behavior and conduct described at the guilty plea hearing and in the victim impact statement "shocking and reprehensible, offensive." The trial court noted that the psychosexual evaluation showed a moderate risk to reoffend, and the examiner found that the defendant's "amenability to benefit from treatment [was] poor" because the defendant "demonstrate[d a] complete denial regarding his sexual offending." The trial court also found that a sentence of full probation would unduly depreciate the seriousness of the offense because "the crime [was] shocking, reprehensible, offensive." The trial court also noted that the defendant failed to fully accept responsibility for his actions, blaming the victim and her mother in the presentence report and in his statement of allocution.

The trial court properly considered the statutory criteria as well as other facts and circumstances supported by the record. Additionally, the trial court's determination is consistent with the purposes and principles of sentencing. Therefore, the trial court was within its discretion in imposing a sentence of confinement. The defendant is not entitled to relief on this issue.

Finally, we note one issue concerning the judgments in this case. While the transcript from the sentencing hearing shows the State was entering a nolle prosequi as to counts one through five and counts seven through twenty, the trial court did not enter separate judgment forms for these counts. *See* Tenn. R. Crim. P. 32(e)(3) ("If the defendant is found not guilty or for any other reason is entitled to be discharged, the court shall enter judgment accordingly."); *State v. Berry*, 503 S.W.3d 360, 364 (Tenn. 2015) (order) ("For charges resulting in a not guilty verdict or a dismissal, the trial court should 'enter judgment accordingly' as to the respective count."). Therefore, we remand the case to the trial court for entry of judgments reflecting the dismissal of counts one through five and seven through twenty.

### *Conclusion*

For the aforementioned reasons, the judgment of the trial court is affirmed. However, we remand this case for entry of judgments in counts one through five and seven through twenty as specified in this opinion.

s/ *J. ROSS DYER*

J. ROSS DYER, JUDGE